16 F.3d 789
 GRAND PRAIRIE COOP, INC. and Patrick W. Simmons, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
and
Missouri Pacific Railroad Company, Intervening Respondent.
 Nos. 93-1889, 93-2528.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 10, 1993.
Decided Feb. 15, 1994.
 
 Gordon P. MacDougall, Washington, DC, Carl M. Miller (argued), Miller, Harper & Rorick, New Haven, IN, for petitioners.
 Ira H. Raphaelson, Asst. U.S. Atty., Crim. Div., Chicago, IL, Laurence H. Schecker (argued), I.C.C., Office of the General Counsel, William P. Barr, Office of U.S. Atty. Gen., Washington, DC, William Redmond, I.C.C., Compliance & Consumer Assistance, Chicago, IL, Catherine G. O'Sullivan, Andrea Limmer, Dept. of Justice, Civ. Div., Appellate Section, Washington, DC, for respondents in No. 93-1889.
 Michael J. Shepard, Asst. U.S. Atty., Crim. Div., Chicago, IL, Robert S. Burk, John J. McCarthy, Laurence H. Schecker (argued), I.C.C., Office of the General Counsel, Janet Reno, U.S. Atty. Gen., John J. Powers, III, John P. Fonte, Dept. of Justice, Antitrust Div., Appellate Section, Washington, DC, Dennis J. Stark, I.C.C., Compliance & Consumer Assistance, Chicago, IL, John W. Clark, Catherine G. O'Sullivan, Andrea Limmer, Dept. of Justice, Civ. Div., Appellate Section, Washington, DC, for respondents in No. 93-2528.
 Joseph D. Anthofer (argued), Omaha, NE, for intervenor-respondent.
 Before POSNER, Chief Judge, and FLAUM and MANION, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 A shipper, joined by a representative of railroad workers, challenges two orders by the Interstate Commerce Commission. The first allows the Missouri Pacific Railroad (now a subsidiary of Union Pacific) to abandon a 9.2 mile stretch of line in rural Illinois unless the shipper subsidizes continued operation of the line. 49 U.S.C. Secs. 10903(a), 10905. The second order establishes the method for determining the amount of the subsidy. Missouri Pacific R.R.--Abandonment, 9 I.C.C.2d 875 (1993). The shipper, Grand Prairie, an agricultural cooperative, has two grain elevators on the segment in question and had shipped 100 carloads over it in the first five months of 1991 but none between then and December 1992, when it shipped 15 carloads. It forecast 200 carloads for 1993; the Missouri Pacific forecast only 60. The Commission, reasoning that the experience of one month (December 1992) was insufficient to ground a realistic forecast for an entire year, accepted the lower estimate but added that even if Grand Prairie shipped 100 carloads a year the railroad would lose money when all costs, including opportunity costs, were reckoned in, as the statute requires. Grand Prairie defends its forecast and adds that the Commission calculated Missouri Pacific's costs incorrectly by ignoring the possibility that the railroad could use the crew that would operate the train on the line to operate another train on a different line on the same day, in which event only a part of the wages of the crew should be allocated to the carriage of Grand Prairie's grain.
 
 
 2
 On the basis of what the Commission knew when it authorized abandonment back in February 1993--the significance of this qualification will become clear shortly--its decision to allow the abandonment of the line was justifiable. The statutory standard, "public convenience and necessity," has been interpreted to require the Commission to compare the cost to the carrier of being required to continue providing service over the line that it wants to abandon with the costs that the shippers and communities served by the line will incur from the loss of railroad service. Colorado v. United States, 271 U.S. 153, 168-70, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926). Whether that is all there is to the standard is not clear, Illinois v. ICC, 722 F.2d 1341, 1346-47 (7th Cir.1983); Association of American Railroads v. ICC, 846 F.2d 1465, 1467 (D.C.Cir.1988), but it is all there is in this case. The only protester against the abandonment is a single shipper which is not contending either that a loss suffered by it should be weighted more heavily than a loss suffered by the railroad or that more than a simple cost-benefit analysis is required to determine whether abandonment is proper. The shipper's argument rather is that the railroad will suffer no loss from being forced to continue service--will in fact lose money if it is allowed to abandon the segment.
 
 
 3
 When the only ground of a shipper's opposition to the abandonment of a service is that the service is profitable to the railroad, the Commission is right to be skeptical. The subsidy provision of the statute enables the Commission to make a protesting shipper put its money where its mouth is, though by the same token a railroad that would have no reason to turn away profitable business in the absence of a subsidy provision might threaten abandonment in an effort to extract the subsidy. Even so, the railroad is bound to know better than either a shipper or a government agency whether continued operation of a line would be profitable. As Grand Prairie stresses elsewhere in its submission, it is a small enterprise (its net worth is $6 million, we were told at argument); it is most unlikely to be knowledgeable about the railroad business. In particular its suggestions as to how the railroad might minimize down time for the crew that would be operating the train carrying grain from Grand Prairie's elevators must be taken with a large grain--of salt. As for Grand Prairie's optimistic forecast of its rail shipping needs, it had every reason, when opposing abandonment, to exaggerate those needs; and the Commission was entitled, given the scant use of the line in recent years, to refuse to attach controlling significance to the December figure--especially since Grand Prairie may have shipped those 15 carloads in order to improve its litigating position. In response, Grand Prairie points out that it has become a member of a railroad car pool that enables it to obtain additional cars for the shipment of its grain--the Missouri Pacific had limited it to 50 cars a year--but it does not explain why, when it had access to 50 cars, it used none.
 
 
 4
 After the Commission approved the abandonment, Grand Prairie wrote a letter to it invoking the subsidy ("offer of financial assistance") provision. 49 U.S.C. Sec. 10905. Buried in the middle of the letter was a brief paragraph asking the Commission to reconsider its decision to allow abandonment in view of the fact that in the previous three months (January through March 1993) Grand Prairie had shipped 104 carloads over the line. True, these were winter months, and in the summer Grand Prairie prefers to ship by barge, which is cheaper. Still, those 104 carloads certainly made Grand Prairie's forecast seem closer to the mark than Missouri Pacific's--which the Commission had accepted. The Commission nevertheless refused to treat Grand Prairie's filing as a petition to reopen the abandonment proceeding, because of its informal character. Grand Prairie argues that this was error.
 
 
 5
 The statute and the Commission's rules permit the filing of a petition to reopen a proceeding on the basis of newly discovered evidence, 49 U.S.C. Sec. 10327(g)(1); 49 C.F.R. Sec. 1152.25(e)(6), and do not prescribe any particular formalities, corresponding to the elaborate formalities that the Federal Rules of Appellate Procedure and circuit rules prescribe for appellate briefs. Fed.R.App.P. 28; 7th Cir.R. 28. The Commission's rules are not completely standardless, however. The petition "shall state in detail the respects in which the proceeding involves material error, new evidence, or substantially changed circumstances," 49 C.F.R. Sec. 1152.25(e)(6) (emphasis added), a requirement arguably not satisfied by Grand Prairie's letter. The Commission is entitled to considerable latitude in interpreting and applying its own procedural rules, Stinson v. United States, --- U.S. ----, ----, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993); Busboom Grain Co. v. ICC, 856 F.2d 790, 792 (7th Cir.1988), and we do not think it abused its discretion in deeming Grand Prairie's petition inadequate. Western Union Telegraph Co. v. FCC, 815 F.2d 1495, 1503 (D.C.Cir.1987); Spanish Int'l Broadcasting Co. v. FCC, 385 F.2d 615, 627-28 (D.C.Cir.1967). Besieged with petitions by shippers opposing abandonments of rail lines, the Commission is not required to view every document it receives with a magnifying glass that might bring into view a request for a particular kind of relief. Since the amount of subsidy is inverse to the amount of traffic expected on a line, the Commission could have understood Grand Prairie's letter to be requesting it to fix a lower subsidy than the facts brought out in the abandonment proceeding might have pointed to, rather than attempting to invoke the Commission's procedure for reopening that proceeding. The Commission had no reason to suppose that it was dealing with some hapless pro se just because the letter invoking the subsidy provision of the statute came from the shipper's manager rather than from a lawyer.
 
 
 6
 And even if the Commission did act arbitrarily--with studied obtuseness--in failing to construe Grand Prairie's letter as a petition to reopen the abandonment proceeding, there would be no point in our reversing. For Grand Prairie can still file, because there is no time limit, Simmons v. ICC, 784 F.2d 242, 245-46 (7th Cir.1985), a proper petition to reopen the abandonment proceeding on the basis of newly discovered evidence. No one argues that the Missouri Pacific is about to rip up the rails, making time of the essence.
 
 
 7
 We come to the subsidy issues. There is a specific and a general issue. We start with the former. The Commission believes that a subsidy, to be deemed adequate (and therefore compel the railroad to continue operations over the line it wants to abandon), must fully indemnify the railroad for the cost of any accident that may occur on the subsidized line. 49 C.F.R. Secs. 1152.32(l ), 1152.36. At first glance this seems an entirely reasonable requirement, since it is a cost that the railroad would avoid by abandoning the line; no line, no accidents on the line. At second glance, the requirement is not so reasonable. Missouri Pacific is self-insured for tort liability up to $36.25 million; above that its (purchased) insurance kicks in. It wants Grand Prairie to promise to indemnify it up to the amount of its deductible, although it does not insist that Grand Prairie actually purchase an insurance policy with a limit of $36.25 million; it will be content if the shipper buys a policy with a limit of $5 million or perhaps even just $2 million. Suppose Grand Prairie bought the larger policy. Then in the unlikely event of a $15 million disaster on the line, Grand Prairie's insurer would pay the first $5 million, Grand Prairie would pay the next $6 million (its entire net worth, hence the most it could be made to pay), and the Missouri Pacific would be stuck with the last $4 million. This would not be complete indemnification but it would satisfy the Missouri Pacific.
 
 
 8
 We are not at all sure that the railroad's concession should be considered a generous gesture rather than an acknowledgment that it has no legal right to demand more. No individual or enterprise buys an insurance policy that has no limit, and therefore no individual or enterprise is assured of complete indemnification. A railroad deemed entitled to such assurance from its shipper would therefore be made better off than it would be in a competitive market, and could therefore be thought to be receiving a subsidy that would exceed the statutory measure: "the avoidable cost of providing continued rail transportation, plus a reasonable return on the value of the line." 49 U.S.C. Sec. 10905(f)(1)(B).
 
 
 9
 This point is obscured by the fact that the Missouri Pacific is self-insured to a point well beyond any plausible estimate of potential liability exposure on this sparsely traveled 9.2 mile line segment. Presumably it is self-insured because it finds self-insurance cheaper than market insurance. (Why, given limited liability, corporations ever buy insurance is a bit of a puzzle, Eljer Mfg., Inc. v. Liberty Mutual Ins. Co., 972 F.2d 805, 809 (7th Cir.1992), but they do, and that is all that is important in this case.) Suppose the railroad found market insurance cheaper, and suppose, artificially but instructively, that it bought a separate liability insurance policy for each segment of its route. Then it would have to decide what policy limit to purchase for this 9.2 mile segment. Suppose it would be $5 million. Then it would have a premium expense for the insurance, plus an off-the-books cost--a contingent expense equal to the expected cost of liability in excess of the policy limit. The latter cost, maybe because it is small, maybe because it is not an accounting cost (although the Commission does count opportunity costs, which are also not accounting costs), has never been considered pertinent in deciding whether to permit a railroad to abandon a line, so we are puzzled by the Commission's belief that it is a cost which the subsidy must cover. Since Grand Prairie has a net worth of only $6 million and the Missouri Pacific a liability exposure of at least $36.25 million (the reason for the qualification will become clear momentarily), the logic of the Commission's position is that Grand Prairie must buy an insurance policy with a limit of at least $30.25 million so that the sum of the policy limit and the cooperative's net worth will equal the railroad's maximum uninsured exposure. Taken literally, a commitment to full indemnification would require even more--would require that Grand Prairie buy an insurance policy without any limit at all, since presumably the railroad's insurance policy, with its $36.25 million deductible, is not unlimited.
 
 
 10
 Not only is the demand for full indemnification difficult to take seriously--and not only does the railroad itself not take it seriously, for it will accept as we have said an insurance policy with a $5 million limit rather than one with a $30.25 million limit or with no limit at all--but it appears to fly in the face of the Commission's own rules. The prescribed methodology for calculating the subsidy includes the calculation of a "casualty reserve account" all right, but as far as we can tell the only costs that may be listed in that account are insurance premia paid and casualty losses sustained. See 49 C.F.R. Sec. 1152.32. For the Missouri Pacific on the segment in question, that sum was $0--as calculated by the railroad itself. Maybe the rules don't mean what they seem to; and certainly there is no reason to penalize the self-insured by counting their cost of insurance as zero merely because it is a contingent or expected cost rather than an out-of-pocket expense. But neither in this nor in any previous case has the Commission discussed the issue in other than conclusional terms, and an administrative ruling "not adequately supported or explained" cannot be upheld unless the correctness of the ruling is obvious, which is not the case here. Busboom Grain Co. v. ICC, supra, 856 F.2d at 796.
 
 
 11
 The broader problem with the Commission's handling of the subsidy phase of the case is its failure to comply with its statutory duty to "determine the amount and terms of subsidy based on the avoidable cost of providing continued rail transportation, plus a reasonable return on the value of the line." 49 U.S.C. Sec. 10905(f)(1)(B) (emphasis added). See also 49 C.F.R. Sec. 1152.27(h)(5) ("if requested, the Commission will determine the amount and terms of subsidy"). Instead of determining the amount of subsidy to which the Missouri Pacific is entitled, the Commission, as in Illinois Central Gulf R.R.--Abandonment, 363 I.C.C. 866 (1981), set forth a "methodology" that the parties were to use to determine the amount of subsidy. See also 49 C.F.R. Sec. 1152.30(a)(2). If this methodology were a formula or algorithm that could be solved for a dollar amount by plugging various values--traffic forecasts, wage rates, tax rates, whatever--into an equation, we would adjudge this adequate if not literal compliance with the statute. For the statute has an internal tension. The Commission is to fix the amount of the subsidy but the amount is to be based on cost (as well as reasonable return on investment--to an economist, just another cost), and if cost varies over time, as it does, so must the subsidy if it is to track the cost. So there is great appeal to a formula that would vary the subsidy automatically as conditions determining the various elements of cost changed.
 
 
 12
 There is a formula of sorts, though it is in the Commission's rules rather than in the challenged order. The rules require the railroad to submit a quarterly report of the actual costs that it has incurred to render the service to the subsidizing shipper, and these costs are used to adjust the subsidy. 49 C.F.R. Sec. 1152.37. But the rules do not resolve all questions concerning allowable costs; the question is whether the "methodology" laid down in the challenged order does so.
 
 
 13
 Grand Prairie rightly regards as critical the question whether it must pick up the tab for the costs of "labor protection" for the crew that will be operating the train hauling its grain--the costs, which can be as high as six years of full wages, to the railroad of laying off a worker should he become redundant. Fox Valley & Western Ltd. v. ICC, 15 F.3d 641 (7th Cir.1994). The Commission ruled that Grand Prairie would be responsible for those costs if the railroad would have avoided them by abandoning the line. It might seem obvious that the railroad would not have avoided them by abandonment, since it is abandonment, by rendering workers surplus, that triggers the imposition of labor protection. But this would have the curious implication that in deciding whether to permit abandonment the Commission would not be permitted to consider any savings in labor costs (because any laid-off workers would retain their wages), even though such savings are in fact a principal motive for abandonment. The puzzle is solved by noting that the laid-off workers' wages are protected for only six years, while the abandonment is forever. On the basis of this reasoning, Illinois Commerce Commission v. ICC, 776 F.2d 355, 358-59 (D.C.Cir.1985), held that the railroad could count its labor costs as costs avoidable by abandonment, after all; and the Commission has accepted this ruling. Abandonment Regulations--Costing, 3 I.C.C.2d 340, 344 n. 5 (1987). Faced with an all or nothing choice on including labor costs in the costs saved by abandonment, the court and Commission chose all.
 
 
 14
 Since, however, the amount of subsidy is recalculated every year, there is no need for so stark a choice in fixing the level of subsidy. Labor costs should be excluded, for the first six years of subsidy, from the costs that the shipper is required to cover, and included thereafter because they would have been avoided thereafter had the railroad been permitted to abandon the 9.2 mile segment. Id. at 344 n. 5. Although the Commission could have been clearer, this is how we interpret its order; and it goes some way toward dispelling the uncertainty concerning the amount of subsidy required to cover labor costs. But not all the way, because the Commission failed to specify the amount of labor costs that the railroad could include in calculating the subsidy due it. The amount cannot be assumed to be zero just because abandonment might have resulted in the railroad's having to pay labor protection, for we do not know how much or to how many workers.
 
 
 15
 Grand Prairie also complains about the Commission's treatment of certain tax expenses, but we think that treatment clear. Yet there is still considerable uncertainty about the exact amount of subsidy required. Not the uncertainty that is inherent in the process of trying to cover costs that cannot be forecast with complete accuracy; the Commission has taken care of that problem by its provision for quarterly ex post adjustments. The relevant uncertainty is uncertainty about the amount of labor costs and of insurance. Even if the Commission were right to insist on full indemnification, it would still have to translate that insistence into a figure, in order that Grand Prairie could calculate the subsidy that is due. This the Commission has refused to do, just as it has refused to specify the labor costs that must be covered by the subsidy.
 
 
 16
 The Commission seems to view its role in subsidy proceedings as that of establishing broad guidelines within which the shipper and the railroad are to negotiate a subsidy; presumably if they fail to do so the Commission will, albeit reluctantly, fix the amount of the subsidy--it has done that in several cases. E.g., Hayfield Northern R.R. v. Chicago & North Western Transportation Co., 467 U.S. 622, 626, 104 S.Ct. 2610, 2613, 81 L.Ed.2d 527 (1984); cf. Illinois Central Gulf R.R.--Abandonment, supra, 363 I.C.C. at 870-77. We suppose, although there is nothing about this in the statute or the rules, that the Commission like other adjudicative bodies can cajole or perhaps even require the parties to subsidy proceedings before it to try to settle their differences over the amount and terms of the subsidy before the Commission steps in and makes a ruling. The Commission has limited resources and knows much less about the details of these transactions than the parties do. Cf. Fox Valley & Western Ltd. v. ICC, supra, 15 F.3d at 645-46. But the Commission did not just knock the parties' heads together. Its final order provides that "if Grand Prairie files a timely acceptance of the terms of the subsidy arrangement" set forth in the Commission's decision--the "methodology," in other words--"it and MP shall be bound by" those terms, while if Grand Prairie fails to file a timely acceptance, as it did, abandonment will be permitted, as it was. So, to take advantage of the subsidy statute, Grand Prairie would have had to agree to be bound by the Commission's "methodology" without knowing even approximately what amount of subsidy it was committed by that "methodology" to paying the Missouri Pacific. That is a large gamble to ask of a small shipper, and we cannot find any statutory authority for the Commission to proceed in such a fashion. The statutory mandate is clear: the Commission is to fix, whether by specifying a dollar figure or by specifying a formula from which a dollar figure can be calculated, the amount of the subsidy required to avert the abandonment of the line. Cf. Hayfield Northern R.R. v. Chicago & North Western Transportation Co., supra, 467 U.S. at 631, 104 S.Ct. at 2616. It has not complied with this requirement.
 
 
 17
 The order authorizing abandonment and the refusal to reopen the abandonment proceeding are affirmed, but the order concerning subsidy is vacated and the subsidy proceeding is remanded to the Commission for further proceedings consistent with this opinion.
 
 
 18
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH DIRECTIONS.