[No. B162067. Second Dist., Div. Four. Aug. 24, 2004.]

WATTS INDUSTRIES, INC., et al., Plaintiffs and Respondents, v.
ZURICH AMERICAN INSURANCE COMPANY, Defendant and Appellant.

COUNSEL

Williams, Smyth & Jacks, Richard D. Williams, Jerid R. Maybaum, Robert Cooper; Wiley, Rein & Fielding and Richard A. Ifft for Defendant and Appellant.

Bien & Summers and Elliot L. Bien for Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Defendant and Appellant.

Weston, Benshoof, Rochefort, Rubalcava & MacCuish, David S. MacCuish, Richard Giller and Andrew M. Gilford for Plaintiff and Respondent Watts Industries, Inc.

Stanzler, Funderburk & Castellon, Jordan S. Stanzler, Ruben A. Castellon and Shane Stafford for Plaintiff and Respondent James Jones Company.

Law Offices of Scott C. Turner, Scott C. Turner; Law Offices of Amy Bach and Amy Bach for United Policyholders as Amicus Curiae on behalf of Plaintiffs and Respondents.

OPINION

**EPSTEIN, Acting P. J.**—This suit involves an insurer's duty to defend a policyholder who claims there is a possibility of coverage in an underlying

suit. The plaintiffs and policyholders in this case are Watts Industries, Inc. (Watts) and James Jones Company (Jones), manufacturers of parts used in municipal water systems. In an underlying suit, various municipalities allege injury to their water systems and lead contamination of water flowing through the systems, resulting from substandard parts sold by Watts and Jones. During the years in which the parts were sold, Watts and Jones held commercial general liability (CGL) policies issued by defendant and respondent Zurich American Insurance Company (Zurich). In the policies, and subject to various exclusions, Zurich promised to defend and indemnify claims for damages resulting from property damage.

The issue in this case is whether there is a triable issue of fact as to the possibility of coverage based on allegations in the underlying complaint. Zurich's chief positions are: (1) there can be no damages based upon lead contamination of the water, because any contaminated water has been used and consumed, has left the water system, and cannot be captured and purified; (2) the underlying complaint alleges no coverable damage to property other than to the substandard parts themselves; and (3) damage to the parts is excluded by a provision in the policy applicable to defective products, and any damage to other property resulting from the replacement of the parts is excluded by the "impaired property" provision.

We conclude that the underlying plaintiffs' allegations of injury to their water raise a possibility of coverage sufficient to trigger a duty to defend; that the claim that substandard parts containing hazardous materials were incorporated into their water systems also raises a possibility of covered property damage; and that Zurich has not shown that all damage is excluded by the impaired property exclusion. This, essentially, was the decision of the trial court, whose judgment we affirm.

## FACTUAL AND PROCEDURAL SUMMARY

For over a century, Jones manufactured waterworks parts for municipal water systems. Watts acquired Jones in 1986 and owned all of Jones's corporate stock until roughly September 1996, when it sold Jones. From 1987 through 1996 and beyond, Jones sold parts to various municipal water agencies and private contractors for use in municipal water systems. These parts contained greater amounts of lead or zinc, and lower amounts of copper, than contract specifications required. The municipal contracts called for parts made of "85 metal," which is 85 percent copper and 5 percent each of tin, zinc, and lead. Jones's parts were made of lower-grade alloys—either "81 metal" (with less copper and tin, more zinc and lead), or "360 metal" (60 percent copper, 40 percent zinc).

In June 1997, Nora Armenta, a former Jones employee, sued Jones, Watts, and Jones's subsequent owners in a qui tam action on behalf of various Southern California municipalities. In a sealed complaint, she alleged that by selling substandard parts, the companies knowingly defrauded the municipalities and violated the False Claims Act. (Gov. Code, § 12651, subd. (a)(1), (2) & (8).) In particular, she alleged that the Jones parts wore out sooner than parts made of 85 metal; that the municipalities and their water customers had been harmed by increased lead exposure from Jones's 81 metal parts, which contain 40 percent more lead; and that substandard Jones parts would have to be dug up and replaced at more than 70,000 sites. Armenta claimed the cities had suffered and were exposed to substantial damages as a result. The complaint was unsealed and served on Jones in March 1998. Armenta filed substantially similar amended complaints in November 1998 and September 2000.

In November 1998, the Los Angeles Department of Water and Power (DWP) filed a complaint in intervention, alleging causes of action for breach of contract, fraud, negligent misrepresentation, and unjust enrichment. DWP alleged that it might have to replace nearly 300,000 Jones parts "to protect the water supply, . . . health and welfare of [DWP customers]." It sought reimbursement of costs to replace all faulty Jones parts, punitive damages, and civil penalties. Thereafter, nearly 30 other water districts and cities from across California joined the action.

In 2000, in answer to interrogatories, several cities clarified the damages they claimed as "the cost of replacement of the substandard Jones parts . . . (including the cost of labor, materials, and appropriate replacement parts)"; damages for diminished service life of the faster-corroding substandard parts; "damages for any decreased strength resulting from Jones's substitution of substandard metal for 85 metal"; "the cost of a lead education, lead-abatement, and/or lead monitoring program"; and "indemnification for any lawsuits based upon the additional lead leached as a result of Jones's provision of substandard parts." Subsequent complaints in intervention added claims for "any additional sums [the municipality] may become obligated to pay in the future to any person arising out of the defendants' conduct."

In April 1998, Watts tendered defense of the suit to Zurich. Zurich had sold CGL policies that covered Watts and its subsidiaries from June 1991 to June 1997. The policies contain standard form provisions under which Zurich promised to pay sums that Watts became "legally obligated to pay as damages" because of covered " 'bodily injury' or 'property damage,' " and to "defend any 'suit' seeking those damages." The policies define "property damage" as "[p]hysical injury to tangible property" or "[l]oss of use of tangible property." Along with purchasing standard CGL coverage, Watts purchased products-completed operations hazard (PCOH) coverage.

The policies contain various standard coverage exclusions typically found in CGL policies. These exclude damage to the insured's own product or work, damage to other property that was not physically injured but was rendered less useful due to defects in the insured's products or work, and damages for product recalls caused by defects in the insured's products or work. A separate endorsement excludes any cleanup costs and damages for bodily injury or property damage resulting from actual, alleged, or threatened discharge of pollutants.

Zurich declined the tender of defense and denied any duty to defend or indemnify either company in connection with the Armenta litigation. It concluded the complaint alleged damages that were purely economic, not due to bodily injury or property damage as defined in the policies, and hence that the damages were not covered. It also concluded that exclusions barred coverage. Watts protested that the complaint raised numerous possibilities for coverage, including bodily injury and property damage, such as "damage to pipes, water supply, etc. of the State of California." Zurich reiterated its argument that the complaint alleged no bodily injury or property damage, argued that it must "render a coverage determination based upon facts and not on mere speculation" as to injury or damage, and again denied any duty to defend or indemnify.

From early 1999 through early 2001, Watts kept Zurich apprised of developments in the case and repeatedly insisted it was entitled to defense and indemnification. Zurich continued to deny coverage. In February 2001, Watts and Jones each sued Zurich for breach of contract and bad faith denial of insurance benefits. (The suits were later consolidated.) Watts sought a declaration that Zurich was obligated to defend and indemnify, plus general and punitive damages. In its answer, Zurich again denied coverage.

Watts's motion for summary adjudication as to Zurich's duty to defend was granted. The trial court noted that the parties disagreed as to legal interpretations of facts but not as to the facts themselves, and that Zurich neither challenged Watts's evidence nor offered new or conflicting evidence. The court found that the underlying lawsuit sought damages for physical injury to municipal water and non-Jones water system parts, including costs for investigation, correction, abatement, monitoring, and public education regarding lead contamination. These claims sought "damages because of property damage" under the policies, thus creating a potential for coverage which triggered Zurich's duty to defend Watts. The court concluded that the exclusions Zurich raised did not preclude CGL coverage, and that Zurich had not shown that the exclusions applied to PCOH coverage or that the PCOH provisions are unambiguous. Based on these findings, the court ordered Zurich to reimburse Watts and Jones for incurred defense costs and pay further costs until the underlying suit was resolved.

After further proceedings to determine Zurich's payment obligation, in August 2002, the trial court ordered Zurich to pay past defense costs and interest. Zurich filed this timely appeal. We denied Watts's motion to dismiss the appeal. We held that although the summary adjudication order on duty to defend normally would not be appealable by itself, the payment order is appealable. Since the latter depends on the former, to review it, we must review both. As such, the summary adjudication and payment order together constitute a collateral final judgment that is appealable.

## DISCUSSION

### I

 Summary adjudication is appropriate to dispose of an issue of duty. (Code Civ. Proc., § 437c, subd. (f)(1); *Moore v. Shaw* (2004) 116 Cal.App.4th 182, 190, fn. 4 [10 Cal.Rptr.3d 154].) Since a motion for summary adjudication involves pure questions of law, we review a ruling on the motion de novo. We consider all uncontradicted evidence and all indisputable inferences reasonably drawn from that evidence in the light most favorable to the opposing party. (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 81 [12 Cal.Rptr.3d 97].)

This case raises various legal issues regarding interpretation of insurance contracts. We begin with a reiteration of some basic rules governing the interpretation of insurance policies and the insurer's duty to defend.

### II

 "When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Contract interpretation is governed by the mutual intention of the parties at the time the contract is formed, which is inferred solely from the written provisions of the contract if possible. (Civ. Code, §§ 1636, 1639; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*).) We construe insurance policy terms in their ordinary and popular sense, unless the contracting parties applied special or technical meanings to particular terms. (Civ. Code, §§ 1638, 1644; *AIU*, at p. 822.) In this case, the policy language is generally standard for the insurance industry, and there is no indication that policy provisions at issue here were actually negotiated, jointly drafted, or intended to have special or technical meanings. We therefore do not depart from the ordinary principles of interpretation. (See *AIU*, at pp. 823–824.)

 A liability insurer owes a broad duty to defend its insured against third party claims that create a potential for indemnity. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose*).) Since an insurer must defend suits which *potentially* seek damages within the policy coverage, including suits in which ultimately no damages are awarded or no coverage is found, the duty to defend is broader than the duty to indemnify. (*Ibid.; Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 107–108 [52 Cal.Rptr.2d 690] (*Armstrong*).) The defense duty arises on tender of defense by the insured, and lasts until the underlying lawsuit is concluded or the insurer shows that there is no potential for coverage. (*Montrose*, at p. 295.) To make this showing, the insurer must establish that " 'the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*' " (*Id.* at p. 300, quoting *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276, fn. 15 [54 Cal.Rptr. 104, 419 P.2d 168].)

The insured and the insurer bear sharply differing burdens in an action regarding the duty to defend. "To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.*" (*Montrose, supra,* 6 Cal.4th. at p. 300.) Any doubt as to whether the duty exists is resolved in the insured's favor. (*Id.* at pp. 299–300.) California courts are "consistently solicitous of insureds' expectations" that their insurers will defend them as promised. (*Id.* at p. 296.)

 An insurer's duty to defend depends not upon the ultimate adjudication of policy coverage, but upon facts the insurer knew at the inception of the underlying lawsuit. (*Montrose, supra,* 6 Cal.4th. at p. 295.) A duty determination usually involves comparing the allegations of the complaint with the terms of the policy. (*Ibid.*) But because modern pleading rules liberally allow amendment, any extrinsic facts known from any source can trigger a duty to defend, even if the complaint does not facially indicate a potential for coverage. (*Ibid; Armstrong, supra,* 45 Cal.App.4th at p. 110, fn. 52.) "[T]he third party plaintiff cannot be the arbiter of coverage." (*Montrose,* at p. 296.)

With these general rules in mind, we turn to Zurich's arguments that their policies afforded no coverage.

## III

Zurich argues the underlying suit does not involve allegations of "damages because of property damage" with regard to alleged lead contamination of water in the municipal water systems, because the remedies sought are merely prophylactic.

The underlying complaint alleges, "[The municipalities] and their water customers have been . . . damaged because Jones's parts made of 81 metal . . . contain 40% more dangerous lead than permitted by [contract] specifications. That increased exposure is exacerbated by the fact that parts from Jones's foundry were generally out-of-spec and often included even more lead than the 7% permitted for 81 metal." The complaint thus alleges that municipal water customers already have been harmed by increased lead exposure from Jones's parts, and implicitly, that the parts already are leaching lead into the municipal water supplies.

The merit of Zurich's argument depends on whether there is any possibility that under these allegations, Watts and Jones could become "legally obligated" to pay any sums "as damages" because of "property damage" covered by the policies.[1] We follow the careful reasoning of the California Supreme Court in *AIU, supra,* 51 Cal.3d 807, which analyzed basic CGL coverage in a case which arose in the context of an analogous set of facts and procedural posture. (*Id.* at pp. 813–818, 843.)

██ "Legally obligated" and "damages" are not defined in the policies, but the Supreme Court gives a broad construction to both terms. The term "legally obligated" covers not only traditional legal damages, but also injunctive relief and recovery of government response costs to clean up environmental pollution. (*AIU, supra,* 51 Cal.3d at p. 825.) Similarly, courts interpret "damages" according to its ordinary and popular definition: a court-ordered monetary payment recovered by a party for loss or detriment it has suffered through the acts of another. (*Id.* at pp. 825–826.) Injunction and response costs are treated in the same way as traditional damages for coverage purposes. (*Id.* at pp. 836–841.) Costs incurred strictly for prophylactic purposes are neither incurred because of property damage nor covered by CGL policies. But remedies which involve remedial or mitigative action constitute covered "damages." (*Id.* at p. 841.)

---

[1] The policies also require that the bodily injury or property damage be caused by an " 'occurrence' that takes place in the 'coverage territory' " during the policy period. Zurich makes no assertion on appeal challenging whether these conditions have been met. It also acknowledges that no issue of willful misconduct under Insurance Code section 533 is raised on this appeal. Continuous, gradual, or progressive property damage, such as that alleged in this case, may constitute an occurrence for CGL coverage. (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 668–673, 685, 689 [42 Cal.Rptr.2d 324, 913 P.2d 878].)

■ In requesting costs for replacement of Jones's parts and for water quality monitoring, the municipalities seek court-ordered monetary payments due to alleged harm caused by Watts and Jones. Whether these payments are viewed as traditional damages or as reimbursement of government response costs, they constitute "damages" under *AIU*. Since the municipalities allege that lead contamination is ongoing, the requested remedies are necessarily at least partly remedial and mitigative, rather than entirely prophylactic, for they address harm which is already occurring, not just harm that might occur. (See *AIU*, *supra*, 51 Cal.3d at p. 843.)

■ The Supreme Court also gives a broad construction to the phrase "because of property damage." Environmental contamination constitutes "property damage" for coverage purposes. (*AIU*, *supra*, 51 Cal.3d at p. 842.) Even unclaimed surface and groundwater is state "property" that may be "damaged" by pollution or contamination. (*Id.* at pp. 816, 817, fn. 6, 818, 842; see also Wat. Code, § 102; *Port of Portland v. Water Quality Ins. Syndicate* (9th Cir. 1986) 796 F.2d 1188, 1193–1194 (*Port of Portland*).) And though a government's primary motive in requiring environmental remediation or mitigation is to protect public health rather than a proprietary interest, if the event precipitating the government's legal action is contamination of property, the resulting costs are incurred because of property damage. (*AIU*, at pp. 842–843.) This is true regardless of who owns the property. (*Id.* at p. 843.)

■ Zurich does not dispute that the municipalities hold property interests in the water they distribute and sell from their water systems. By alleging this water is contaminated with lead, the municipalities have claimed covered property damage under *AIU*. Although a major reason for their request for parts replacements and water monitoring is to protect the public health, the resulting costs are incurred because of property damage. (See *AIU*, *supra*, 51 Cal.3d at pp. 842–843.) As such, the municipalities seek sums Watts and Jones would be legally obligated to pay because of property damage. This raises the possibility of coverage under the CGL provisions in the policies.

Zurich argues that contamination of water only can be treated as covered property damage in cases involving "real (rather than imagined) claims" for the cleanup of "existing in situ contamination of water bodies rather than measures taken to forestall future damage." It contends that the "underlying plaintiffs make no claim for clean-up of the water supply allegedly contaminated" by leaching lead, and that "there can be no such claim because the underlying municipal plaintiffs have distributed and sold in accordance with their regular practices every drop of water that has been run past a Watts product." As such, unlike water contamination cases involving cleanup of an

oil spill in a river, "there is simply no claim here seeking damages for injury to (or even loss of use of) water." Zurich also argues that the remedies sought by the municipalities, particularly removal of the substandard Jones parts, are nothing more than "purely prophylactic" measures, not covered under a CGL policy.

· This complicated argument avoids analysis of several of its underlying premises. First, far from being merely an "imagined" or hypothetical claim, the municipalities' claim is that increased leaching of lead caused by faulty Jones parts already has caused, and is still causing, serious and health-endangering harm to their water. This is no more imaginary, hypothetical, or futuristic than a claim for the cost to clean up an oil spill in a river. Second, no evidence is cited or found to support Zurich's conclusory assertion that all contaminated water has been distributed and sold, and is therefore gone from the water systems. And even if contaminated water has left the system, it was replaced by other water. There is nothing in the record to establish that lead already leached has left the system and hence ceased to contaminate system water.

Third, Zurich cites no authority to support its argument that coverage for water contamination can exist only if the contaminated water is impounded in a contained area where it can be cleaned up, nor the implicit related assumption that an oil spill into a flowing river (*Port of Portland, supra,* 796 F.2d at p. 1190), or seepage of toxic chemicals into an underground aquifer (*AIU, supra,* 51 Cal.3d at p. 815), are situations totally unlike contamination of municipal water systems. In this case, as in *AIU,* "The provisions at issue here do not specify that coverage hinges on the nature or location of property damage. We therefore construe them to encompass damages because of property damage in general . . . ." (*Id.* at p. 843.)

■ Nor are the remedies sought purely prophylactic, as Zurich contends. In *AIU,* the court defined prophylactic costs as those "incurred to pay for measures taken in advance of any release" of toxic materials. (*AIU, supra,* 51 Cal.3d at p. 843.) Preventing releases that have not yet occurred or caused harm is different from stopping releases that already are occurring and causing harm. The former is prophylactic; the latter is remedial or mitigative and results in costs that constitute covered damages. (See *id.* at p. 841.) Here, the municipalities allege harmful ongoing lead leaching. To stop that ongoing release is not mere prophylaxis.

■ In a similar argument, Zurich contends that because the municipalities sold and distributed the lead-contaminated water, even if the water is contaminated there could be no legally cognizable damages on that account. Zurich

implicitly argues that a proper claim could be presented only if the municipalities were unable to sell water, or if they faced immediate, direct financial losses or lawsuits by customers alleging bodily injury. As we have seen, the Supreme Court's construction of the key coverage terms is much broader. Any existing environmental contamination constitutes sufficient property damage, and the cost to address that contamination, including the cost of injunctions or government responsive actions, may constitute covered damages. (*AIU, supra*, 51 Cal.3d at pp. 842–843; see also *Armstrong, supra*, 45 Cal.App.4th at p. 93.) The municipalities' allegations are sufficient to meet that standard. Zurich cites no contrary authority.

Zurich also contends that remediation and mitigation should be narrowly defined to include only actual cleanup of contaminated water. Again, no authority is cited to support this narrow definition. By standard dictionary definition, "remediation" is action taken to correct or supply a remedy for a problem, while "mitigation" is action taken to make a problem less severe or intense. (See, e.g., American Heritage Dict. (2d college ed.) pp. 804, 1045.) Removal of the Jones parts would stop the alleged ongoing leaching of lead into the municipal water. It fits within a reasonable definition of both remediation and mitigation, even though it does not involve impounding and purifying water already contaminated.[2]

■ In sum, Zurich does not deny that municipal water might have been contaminated with excess lead from Jones's noncompliant parts, but treats the matter as having no legal significance. But the allegations are ·that the water—municipal property—was, and is, damaged in such a way as to require costly action to address ongoing harm. Zurich urges us to view the damaged property here as discrete batches of water which do not count because they leave the water systems soon after they become contaminated. But this flow analysis also cuts in the other direction, for even as some contaminated water is leaving the system, other water is becoming contaminated. (See *Santa Clarita Water Co. v. Lyons* (1984) 161 Cal.App.3d 450, 461 [207 Cal.Rptr. 698] ["Water is not stationary . . . and it may be replenished from its source unlike other natural deposits"].) Water becomes personal property when it is appropriated and placed in a container (*ibid.*), including artificial watercourses or conduits through which water flows. (*Parks Canal and M. Co. v. Hoyt* (1880) 57 Cal. 44, 46; *Kidd v. Laird* (1860) 15 Cal. 161, 180.) An appropriator owns all the water in such a container as

---

[2] Zurich does not argue that any exclusions apply regarding damage to the municipal water. Although Zurich's answer pleaded an affirmative defense based on the separate endorsement broadly excluding coverage for damage caused by pollution, it did not raise that issue in its opposition to summary adjudication or on appeal.

an entire corpus or body. (*Lindblom v. Round Valley Water Co.* (1918) 178 Cal. 450, 456 [173 P. 994]; *Parks Canal, supra,* at p. 46; 62 Cal.Jur.3d (1981) Water, § 378, pp. 408–410.)

 Since a municipal water system is a conduit through which water flows continuously, as Zurich acknowledges, the municipality owns all the water in its system at any one time as an entire body. (See *Lewis v. Scazighini* (1933) 130 Cal.App. 722, 724 [20 P.2d 359].) According to the complaint, at any one time, a portion of the total water in the system is becoming contaminated. Thus at any one time, the municipality's water, as a whole, is damaged. Under the language of the policies, we find the allegation of lead contamination of water is sufficient to raise a possibility of coverage, and that Zurich has not shown coverage to be impossible.

## IV

Zurich argues the underlying suit does not involve allegations of "damages because of property damage" to any property other than the Jones parts, since the underlying plaintiffs do not claim physical injury to other parts of the municipal water systems.

As with the preceding discussion, we must determine whether the underlying allegations raise any possibility that Watts and Jones could become legally obligated to pay damages because of covered property damage. Although here we consider damage to property other than water, the allegations of hazardous lead leaching remain part of the equation.

 As we have seen, standard CGL policies such as those in this case define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." (See *F. & H. Construction v. ITT Hartford Ins. Co.* (2004) 118 Cal.App.4th 364, 371–372 [12 Cal.Rptr.3d 896] (*F & H*).) Courts applying standard CGL policy language generally agree that the incorporation of a defective component or product into a larger structure or system does not constitute physical injury to tangible property, unless and until the defective component physically injures some other tangible part of the larger system or the system as a whole. (*Id.* at p. 372.) In other words, the mere presence of a defective part causing no immediate harm does not produce physical injury. (*Ibid.*)

 However, where products or work containing hazardous materials have been incorporated into other products or structures, courts have found

immediate harm and physical injury to other property at the moment the incorporation occurred. (*Armstrong, supra,* 45 Cal.App.4th at pp. 90–94; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 865–866 [93 Cal.Rptr.2d 364] (*Shade*).) In *Armstrong,* the court held that incorporation of asbestos-containing building material (ACBM) in a building caused immediate physical injury to that building, regardless of whether the ACBM had begun to release asbestos fibers. The court reasoned, "because the potentially hazardous material is physically touching and linked with the building, and not merely contained within it, the injury is physical even without a release of toxic substances into the building's air supply." (*Armstrong,* at p. 92.)

In *Shade,* a company produced "nut clusters" for a breakfast cereal manufacturer by combining diced almonds with syrup. It sued a supplier who provided diced almonds contaminated with wood splinters that got into finished nut clusters and boxes of cereal. The supplier sought defense and indemnification from its insurer. (*Shade, supra,* 78 Cal.App.4th at pp. 861–862.) On appeal, the court followed *Armstrong* in "finding property damage where a potentially injurious material in a product causes loss to other products with which it is incorporated." (*Id.* at p. 865.) The court concluded that the wood splinters in the almonds caused covered property damage to the nut clusters and cereal products in which the almonds were incorporated. (*Id.* at p. 866.)

In both *Armstrong* and *Shade,* the court "agree[d] with the formulation put forth by the Seventh Circuit Court of Appeals" in *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co.* (7th Cir. 1992) 972 F.2d 805 (*Eljer*). (*Armstrong, supra,* 45 Cal.App.4th at p. 91; see *Shade, supra,* 78 Cal.App.4th at pp. 865–866.) In *Eljer,* the majority reasoned that "physical injury" to property included "a loss that results from physical contact, physical linkage, as when a potentially dangerous product is incorporated into another and, because it is incorporated and not merely contained (as a piece of furniture is contained in a house but can be removed without damage to the house), must be removed, at some cost, in order to prevent the danger from materializing. There is an analogy to fixtures in the law of real and personal property—improvements to property that cannot be removed without damaging it." (*Eljer, supra,* at p. 810.)

Unlike *Armstrong* and *Shade, Eljer* did not involve hazardous materials. Rather, it concerned defective plumbing systems that worked adequately for a time, then failed with resulting damage. The *Eljer* majority found physical injury by incorporation at the moment of installation, before actual damage occurred. (*Eljer, supra,* 972 F.2d at pp. 807, 813, 814.) Other courts have rejected the finding of physical injury by incorporation on the facts in *Eljer.* (See, e.g., *F & H, supra,* 118 Cal.App.4th at pp. 375–376; *Traveler's Ins.*

*Co. v. Eljer Mfg., Inc.* (2001) 197 Ill.2d 278 [757 N.E.2d 481, 496–502, 258 Ill.Dec. 792].) But courts applying California law have not challenged the application in *Armstrong* and *Shade* of the *Eljer* court's reasoning to cases involving incorporation of hazardous products. (*F & H*, at pp. 374–375; *Seagate Technology v. St. Paul Fire and Marine Ins.* (N.D.Cal. 1998) 11 F.Supp.2d 1150, 1154–1155.)

In this case, the underlying complaint alleges that the Jones parts have been built into municipal water systems, like the ACBM in *Armstrong* or the contaminated almonds in *Shade*. It claims the parts are hazardous products which leach excess lead into municipal water supplies and threaten public health and safety. The complaint also alleges that the parts may have to be dug up and replaced. This indicates that the parts are not easily removable, unlike the house furniture described in *Eljer*. (*Eljer, supra*, 972 F.2d at p. 810.) In *Armstrong*, the court found physical injury by incorporation even though the ACBM had not begun releasing asbestos (*Armstrong, supra*, 45 Cal.App.4th at p. 92); here the alleged lead leaching already is occurring. Thus the complaint makes a sufficient prima facie showing of physical injury to tangible property by alleging that the Jones parts are hazardous products incorporated into the water systems.

Zurich argues that the underlying plaintiffs only allege accelerated corrosion and wear of Jones parts and do not allege any damage to other, non-Jones parts of the municipal water systems. In alleging structural problems due to the use of substandard parts, the underlying plaintiffs do indeed focus on damage to the Jones parts themselves. But explicit allegations of damage to particular non-Jones waterworks parts are not required to show physical injury to tangible property, since the Jones parts fit within the incorporation analysis under *Armstrong*, as we have discussed.

For these reasons, we conclude that the underlying plaintiffs' allegation that the Jones parts are incorporated hazardous products raises the possibility of covered property damage to municipal water systems under *Armstrong* and *Shade*. Zurich offered no evidence to refute this prima facie showing, and its legal arguments do not negative that coverage.

## V

Even if there is a possibility of covered damage to property under the CGL coverage provisions, coverage may be defeated by policy exclusions. Zurich argues that any resulting damage falls within policy exclusions. It contends the underlying plaintiffs primarily seek to replace the Jones parts, damage to

those parts is excluded by the "your product" exclusion, and the "impaired property" exclusion excludes any other damages resulting from the products or their replacement.[3]

Exclusion k, "Damage to Your Product," excludes " '[p]roperty damage' to 'your product' arising out of it or any part of it." Exclusion m, "Damage to Impaired Property or Property not Physically Injured," excludes " '[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of: [¶] (1) [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work' . . . ." The policies define "your product" to mean "[a]ny goods or products . . . manufactured, sold, handled, distributed or disposed of" by the insured or those it controls. "Impaired property" means "tangible property, other than 'your product' . . . that cannot be used or is less useful" because it "incorporates 'your product' . . . that is known or thought to be defective, deficient, inadequate or dangerous [¶] . . . [¶] if such property can be restored to use" by the "repair, replacement, adjustment or removal of 'your product' or 'your work.' "

Damage to the Jones parts themselves is removed from CGL coverage by the "your product" exclusion, and Watts and Jones do not argue otherwise. Consequently, our analysis must focus on the impaired property exclusion. Zurich argues that since the water systems can be fully restored to use by the replacement of the Jones parts, the impaired property exclusion precludes coverage for all replacement costs, "including damage to other property during the course of 'repair, removal or replacement.' "

The impaired property exclusion "does not apply where the other property [which incorporates the allegedly faulty work or product] has been physically injured." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2003) ¶ 7:1484.3, p. 7E-35; see also, e.g., *Gaylord Chemical Corp. v. ProPump, Inc.* (La. Ct.App. 2000) 753 So.2d 349, 355; *Standard Fire Ins. Co. v. Chester O'Donley* (Tenn. Ct.App. 1998) 972 S.W.2d 1, 10; *Imperial Cas. & Indem. v. High Concrete Structures* (3d Cir. 1988) 858 F.2d 128, 136; *Lang Tendons, Inc. v. Northern Ins. Co. of New York* (E.D.Pa. 2001) [2001 WL 228920 at p. 9]; *McKinney Builders II, Ltd. v. Nationwide Mut. Ins. Co.* (N.D.Tex. 1999) [1999 WL 608851 at p. 9]; *Transcontinental Ins. v. Ice Systems of America* (M.D.Fla. 1994) 847 F.Supp. 947, 950.) As we have seen, under the reasoning in *Armstrong*, the municipalities have alleged

---

[3] Zurich did not raise the applicability of any other policy exclusions as an issue in its opposition to summary adjudication or in this appeal.

physical injury to their water systems through the incorporation of the Jones parts, and Zurich did not prove the absence of such injury. Thus, the impaired property exclusion does not apply here.

 Moreover, although Zurich assumes that replacement of the Jones parts will cure all problems with the water systems, the allegations of the underlying complaints do not. In addition to seeking replacement of the parts, the municipalities also claim costs for lead monitoring and abatement. As such, they implicitly allege that mere replacement of the parts will not fully restore the water systems. As with contamination of the water, Zurich offered no evidence to prove the impossibility of continuing contamination of the water systems even after the replacement of the Jones parts. The insurer must prove the applicability of coverage exclusions. (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1071 [124 Cal.Rptr.2d 142, 52 P.3d 79].) Zurich has not done so.[4]

Noting, correctly, that there are few California decisions that have applied the impaired property exclusion, Zurich and amicus curiae Complex Insurance Claims Litigation Association cite cases from other states. These decisions involve situations where there was no physical injury to the property which incorporated allegedly faulty work or products. They are thus inapposite.

We conclude that Zurich has not established that the impaired property exclusion bars the possibility of coverage under the standard CGL terms, since it has not negated any possibility of physical injury to the municipal water systems by incorporation of the Jones parts.

## VI

Zurich argues that the language in the policies regarding the PCOH coverage is unambiguous, and that as such, coverage for PCOH is limited by the same exclusions that limit CGL coverage. We do not reach this issue, since we have found the possibility of coverage under the standard CGL terms for damage to both the municipalities' water and other property

---

[4] We note that various commentators or courts have found the impaired property exclusion to be problematic, ambiguous, "difficult," "tricky," "unintelligible," or "too complex to receive a uniform interpretation." (4 Bruner & O'Connor, Construction Law (2002) Insurance, § 11:49; see also *Serigne v. Wildey* (La. Ct.App. 1992) 612 So.2d 155, 158.) This criticism is understandable. An insurer cannot escape its duty to insure by means of an unclear exclusionary clause. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648 [3 Cal.Rptr.3d 228, 73 P.3d 1205]; *Fire Insurance Exchange v. Superior Court* (2004) 116 Cal.App.4th 446, 467 [10 Cal.Rptr.3d 617].)

because of the Jones parts, and that the CGL exclusions raised by Zurich do not negate this possibility.

## DISPOSITION

The orders are affirmed. Respondents are to have their costs on appeal.

Hastings, J., and Curry, J., concurred.

A petition for a rehearing was denied September 15, 2004, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 1, 2004.